PEOPLE ex rel. LYNCH v. WALDO, Police Com'r.

(Supreme Court, Appellate Division, First Department.  February 7, 1913.)

MUNICIPAL CORPORATIONS (§ 185*)—POLICE FORCE—REMOVAL OF OFFICER—EVIDENCE TO SUSTAIN CHARGES.

Evidence, on proceeding for removal of a member of the uniformed force of the police department of New York City, *held* sufficient to sustain findings that, in his capacity of examining engineer, boiler squad, he, on examination of a person for an engineer's license, asked questions by prearrangement, enabling the candidate to pass, and that he made false statements to his superior officer.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 492–509; Dec. Dig. § 185.*]

Scott and Dowling, JJ., dissenting.

Certiorari, on the relation of John Lynch, against Rhinelander Waldo, as Police Commissioner of the City of New York, to review the action of respondent in removing relator as a member of the uniformed force of the police department of the City of New York.  Writ dismissed, and proceedings affirmed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, CLARKE, SCOTT, and DOWLING, JJ.

Florence J. Sullivan, of New York City, for relator.
Harry Crone, of New York City, for respondent.

INGRAHAM, P. J.   There are two charges against the relator: The first, that in the examination of a certain William H. Black, to determine his qualifications to hold a third-class engineer's license, the relator, in his capacity of examining engineer, boiler squad, asked said Black certain questions by prearrangement, which action on the part of the relator tended to defeat the just purposes of the examination, either wholly or in part; second, that the relator made false statements to the deputy police commissioner, when asked by the commissioner whether he had spoken to Patrolman Graham on the morning of November 25, 1911, and he answered that question in the negative, which answer was false.

To prove the first charge, Black, the applicant for the license, testified that he presented his first application for an engineering license to the relator on October 18, 1911.  He was examined on that day, and was rejected, and was told to go back and get posted by some engineer and return in three months.  Instead of waiting three months, he returned on November 1st, and presented the same application to the relator, and the relator asked him questions in relation to the boilers in the plant at police headquarters, and, when Black replied that he had not studied them, the relator told him that he could not do anything for him, and directed him to go down and see what kind of boilers they were, how they were fixed, and to come back and give a detailed description of them.  Black applied for permission to examine the boilers at police headquarters, but was refused permission by the superintendent of the building.  Black again returned on Novem-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ber 25, 1911, and was given another examination by the relator, when he was asked certain specified questions, answered them all correctly, and received a percentage of 100 per cent. and was granted his license. It appeared that on the morning that Black was examined he went to see Officer Graham, who seemed to be on intimate terms with the relator. Graham had been a member of the boiler squad, but had been relieved from that duty at the time of this examination. Black testified that he was aware, before he came before the relator on that morning, of what questions he would be asked, and that he had received this information from Officer Graham prior to his examination; and the relator asked him the exact questions that Graham had told him would be asked him, and he answered the questions as he had been instructed by Graham to answer them. It also appeared that Black had called on Graham at his residence at half past 7 o'clock in the morning of the day that he was examined; that he and Graham left together for police headquarters, but they separated at the corner of Grand and Center streets; that Black then proceeded to the examiner's room at police headquarters, and there found Graham and the relator and two other persons in attendance; and that the examination was conducted by the relator, and was oral. The relator, on the stand, absolutely denied having received any information from Graham in relation to Black's examination, and denied having any conversation with Graham on the morning of the examination, although it was subsequently proved that he greeted him when he entered the room.

The first question presented is whether this testimony sustains the finding that the relator was guilty of the first charge—that in his capacity of examining engineer of boiler squad he asked certain questions by prearrangement. Graham, who had been at one time a member of this boiler squad, had been relieved from that duty and remanded to patrol duty. He had no official business at police headquarters on the morning of this examination. Graham left his home for police headquarters with Black, but arrived at police headquarters before him, and was in the same room with the relator before Black presented himself for examination. There was ample opportunity, therefore, for Graham to inform the relator what questions Black could answer, so as to pass his examination and obtain his certificate. Just what questions the examiner would ask could have been known to no one except the examiner, as the relator testified that he varied the questions from time to time. Twice before Black had attempted to pass his examination, but before he knew what questions he was to be asked and how to answer them he failed in his examination. The third time, however, after his interview with Graham, he knew what questions were to be asked, and had been instructed how to answer them, and he passed the examination. There is a coincidence here that is a little difficult to explain upon the hypothesis of innocence. In these examinations, conducted as this record shows they are, there is ample opportunity for bribery or corruption that is most difficult to detect. No person could be placed in charge of an engine or boiler in the city of New York without having received from the police de-

partment a license, and thus all persons engaged in this occupation are subject to the members of this boiler squad. The efforts made by the head of the department to get rid of officers who have been guilty of such misconduct should not be so hampered as to prevent the dismissal of the policeman, except upon proof of guilt which would justify an indictment.

I think no one reading this record could doubt that the attitude of the relator as an examiner towards Black had entirely changed between the first and second examination, and the third, in which he was successful. Did that change occur because of an increase of knowledge, or evidence of greater efficiency by Black in the discharge of his duty? There is no evidence to justify such an assumption. Certainly, so far as appears, Black had no greater knowledge of working an engine, or the performance of the duties of an engineer, when he appeared for the third examination, than when he appeared at the other two, except the instructions that he had received from Graham on the morning of the third examination, and then Graham had told him just what questions would be asked and just how to answer them. When he got to police headquarters, he was by the relator asked just the questions Graham told him would be asked. The answers were as Graham told him they would be, and he passed the examination. Of course, both the relator and Graham denied that this remarkable change of attitude of the relator had any connection with Black's visit to Graham's house on the morning of the examination, or that anything that happened as between Graham and Black produced this change of attitude; but the respondent, who knew the men and the methods that were adopted, was satisfied that this evidence was sufficient to show that there had been some secret understanding between Black and Graham and the relator, and that the examination, conducted as it was, was the result of such an understanding, and I cannot say that that collusion is without evidence to sustain it.

In regard to the other charge, of making a false statement to the first deputy police commissioner, while that of itself might not be sufficient to justify the dismissal of the relator from the force, it was characteristic of the relator's attitude towards his superior officer and his relation to Graham. There was evidently some suspicion on the part of the police authorities that these examinations were influenced by improper considerations. After this examination was completed, the relator was called in before the first deputy commissioner and was asked a number of questions, among others, whether he (relator) had spoken to Officer Graham on the morning of November 25, 1911, to which the relator replied in the negative. The testimony was substantially uncontradicted that, when Graham came into the room, he saluted the relator by some such conversation as "Hello, Jack," and he talked to Lieutenant Breen, also a member of the squad, about five minutes, and Graham also had some conversation with other members of the boiler squad who were present before Black's examination. It was also proved that Officer Graham, when examined by the first deputy commissioner, admitted that he had a conversation with the relator, both with him and Lieutenant Breen.

This certainly was not a frank answer to the commissioner, when he was asked whether he spoke to Officer Graham on the morning of the examination. The deputy police commissioner testified that the relator said that he did not speak to Graham, that he saw Graham standing in a room, that he did not hear Graham speak to Fitzpatrick, and did not hear Fitzpatrick say anything to the relator; but on the testimony at this hearing he admitted that he heard Graham talking to Fitzpatrick.

Taking all the testimony—and I have examined it all with care—I think there was a basis for the commissioner finding that this examination of Black by the relator was the result of some arrangement between the relator and Graham, and that Black was allowed to pass this examination, where he had failed before, because of some such arrangement, communicated in some way by Graham to the relator.

I think, therefore, that the judgment of the commissioner was sustained by the evidence, and that the writ should be dismissed.

McLAUGHLIN and CLARKE, JJ., concur. SCOTT and DOWLING, JJ., dissent.